In the Matter of the Suspension of
the Driving Privileges of

Kolby C. HANSON,
*Petitioner-Respondent,*

*v.*

DRIVER AND MOTOR VEHICLE
SERVICES DIVISION (DMV),
a division of the Department of Transportation,
*Respondent-Appellant.*

Columbia County Circuit Court
14CV01282; A157973

375 P3d 563

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Judy C. Lucas, Assistant Attorney General, filed the brief for appellant.

No appearance for respondent.

Before Ortega, Presiding Judge, and Lagesen, Judge, and Garrett, Judge.

**GARRETT, J.**

The Department of Motor Vehicles (DMV) suspended petitioner's driving privileges after he refused a police officer's request that he submit to a urine test, ORS 813.131; ORS 813.410. The trial court reversed DMV's order after concluding that the requesting police officer did not possess a required statutory certification in drug-impairment recognition. DMV appeals. The question before us is whether a law enforcement officer who was certified in drug-impairment recognition by the *Department* of Public Safety Standards and Training was authorized to request a urine test from petitioner, even though the relevant statute at the time required an officer to be certified by the *"Board* of Public Safety Standards and Training." ORS 813.131(2) (2013), *amended by* Or Laws 2015, ch 11, § 1 (emphasis added).[1] We conclude that he was. Accordingly, we reverse and remand.

Although this case was appealed from the circuit court, "we review the underlying administrative order to determine whether the [administrative law judge] ALJ correctly interpreted and applied the law and whether the order is supported by substantial evidence." *Bianco v. DMV*, 257 Or App 446, 448, 307 P3d 470 (2013); *see also Shakerin v. MVD*, 101 Or App 357, 360, 790 P2d 1180 (1990) (explaining that, because ORS 813.450, which provides for the appeal of DMV orders, "use[s] the word 'court' to mean both the circuit court and the Court of Appeals and provide[s] that the court shall review the division's order[,] *** we review [DMV's] order, not the judgment of the circuit court"); *see also* ORS 813.450(4) and (5). We recite the facts as found by the ALJ. *Bianco*, 257 Or App at 448. Substantial evidence exists "'when

_____

[1] As amended, ORS 813.131(2) now provides:

"A police officer may not request a urine test unless the officer is certified by the *Department* of Public Safety Standards and Training as having completed at least eight hours of training in recognition of drug impaired driving and the officer has a reasonable suspicion that the person arrested has been driving while under the influence of a controlled substance, an inhalant or any combination of an inhalant, a controlled substance and intoxicating liquor."

(Emphasis added.) Unless otherwise specified, we refer to the 2013 version of the statute throughout this opinion.

the record, viewed as a whole, would permit a reasonable person to make that finding.'" *Golliher v. DMV*, 173 Or App 586, 589, 22 P3d 780 (2001) (quoting ORS 183.482(8)(c)).

The ALJ found the facts as follows. Officer Castilleja observed petitioner fail to properly signal in the early morning hours of New Year's Day in 2014. Castilleja followed petitioner's car until it came to a stop and parked "crookedly" in a parking lot. After making contact with petitioner and observing his physical symptoms, Castilleja suspected that petitioner was driving under the influence of an intoxicant (DUII), ORS 813.010. Castilleja administered a breath test, which revealed a blood alcohol content of "less than .08 percent by weight." Castilleja asked petitioner to perform field sobriety tests; petitioner agreed, and he either was unable to perform the tests or failed them. Castilleja arrested petitioner for DUII. At the police station, Castilleja asked petitioner to submit to a urine test, which petitioner refused. DMV subsequently sent petitioner a notice that his driving privileges had been suspended, pursuant to ORS 813.132 (penalties for refusal of a urine test).

Petitioner requested a hearing on the suspension. Petitioner argued, as relevant on appeal, that his suspension was invalid because Castilleja was not certified to request a urine test under ORS 813.131(2) (2013) (requiring certification by the Board of Public Safety Standards and Training). Petitioner noted before the ALJ that ORS 813.131(2) "is interesting *** because *** the Board of Public Safety Standards and Training no longer exists[.] *** [W]e now have a different department—[but] the statute hasn't been changed."

Castilleja testified at the hearing that he had taken an eight-hour course in recognizing drug-impaired driving and received a certificate of completion from the Department of Public Safety Standards and Training.

Following the hearing, the ALJ issued a final order concluding that the DMV's suspension was valid. The ALJ determined that "the officer established that he was certified by the Department of Public Safety Standards and Training as having completed 8 hours of training in recognition of

drug impaired driving. As a result, the officer legally asked Petitioner to take a urine test."

Petitioner sought judicial review of the ALJ's order to the circuit court, arguing again that Castilleja did not have a valid certification because the statute required certification by the "Board." DMV responded that "holding certification issued by [the department] is the same as being certified by the board," because the department "is carrying out *** the training and certifying *** based on what the board is approving as policy."

The court was unconvinced:

"I'm just not understanding why the statute doesn't say that the department shall issue if you're saying that's what is the intended language of the statute.

"*****

"[I]f you don't have a certificate from the appropriate board, I'm not buying the argument that the individual has the ability to request the urine test."

The court reversed the ALJ's order and reinstated petitioner's driving privileges. DMV appeals and contends that the trial court erred in interpreting the statute to preclude urine testing by an officer who is certified by the department rather than the board. According to DMV, the statutory scheme as a whole makes it clear that the legislature intended a certification by the department to be sufficient. We agree.

In construing ORS 813.131(2), our task is to discern the intent of the legislature. *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997). We begin by first considering the statute's text and context, which "must be given primary weight in the analysis." *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009). The context of a statute "may include other provisions of the same statute and related statutes, prior enactments and prior judicial interpretations of those and related statutes, and the historical context of the relevant enactments." *Young v. State of Oregon*, 161 Or App 32, 35, 983 P2d 1044 (1999) (internal citations omitted); *see also State v. Ofodrinwa*, 353 Or 507, 512, 300 P3d 154 (2013) (context in which to interpret a statute includes "the

statutory framework within which the law was enacted" (internal quotation marks omitted)). Typically, only statutes that were already enacted at the time the statute at issue was enacted "are pertinent context for interpreting that statute." *Gaines*, 346 Or at 177 n 16.

Where appropriate, we may also consider the statute's legislative history. *Id.* at 172. Whether a court will conclude that the legislative history is helpful in determining legislative intent "will depend on the substance and probative quality of the legislative history itself." *Id.* Lastly, should the legislature's intent remain "unclear" after examining the text, context and legislative history of a statute, the court applies "general maxims of statutory construction to aid in resolving the remaining uncertainty." *Id.*

At the time of petitioner's license suspension, ORS 813.131(2) provided:

> "A police officer may not request a urine test unless the officer is certified by the *Board* of Public Safety Standards and Training as having completed at least eight hours of training in recognition of drug impaired driving and the officer has a reasonable suspicion that the person arrested has been driving while under the influence of a controlled substance, an inhalant or any combination of an inhalant, a controlled substance and intoxicating liquor."

(Emphasis added.) When ORS 813.131 was first enacted, in 1995, the board was responsible for, among other things, training and certifying police officers. *See former* ORS 181.640(1)(d) (1995), *renumbered as* ORS 181A.410(1)(d) (2015). In 1997, however, the legislature created the Department of Public Safety Standards and Training. *See* House Bill (HB) 3738 (1997); Or Laws 1997, ch 853, § 1. The purpose of creating the new department was, in part, to allow the 23-member volunteer board to function as a "policy-making body" and to relieve it of the responsibilities of day-to-day administration. Tape Recording, Senate Rules and Elections Committee, HB 3738, Jun 19, 1997, Tape 111, Side A (statement of Dave White, Assistant Director, Department of Administrative Services). The division of responsibilities upon creation of the department was that "the board [was] responsible for forwarding their policies to [the] director

[of the department,] who [was] then responsible for carrying them out." Tape Recording, Senate Rules and Elections Committee, HB 3738, Jun 19, 1997, Tape 111, Side A (statement of Kevin Campbell, Oregon Association of Chiefs of Police).

As part of the department's creation, the legislature amended various provisions in ORS chapter 181—the chapter governing public safety standards and training—to shift administrative functions from the board to the new department. *See* Or Laws 1997, ch 853, §§ 1-60. Following those changes, the board performed an oversight role as to policies implemented by the department; the amendments also called for collaboration between the board and the department on policy matters. *Id.*; *see also, e.g.*, Or Laws 1997, ch 853, § 4(a) ("The department shall recommend and the board shall establish by rule reasonable minimum standards of physical, emotional, intellectual and moral fitness for police officers [.]"); Or Laws 1997, ch 853, §§ 2(5)(a)-(f) ("It shall be the policy of the state that * * * [t]he board and department exist to develop talented individuals into public safety professionals * * *[;] [t]he board and department shall promote the safety, efficiency, effectiveness, self-sufficiency and competence of public safety agencies and professionals[;] [t]he board and department shall consult with and inform each other fully on matters of public safety standards, training and certification[;] * * * [t]he board may adopt or approve all policies, standards and minimum requirements for public safety certifications and training[;] * * * [t]he department may administer operations and procedures and implement or apply the policies and standards of the board[.]").

Notably, in those 1997 amendments to ORS chapter 181, the legislature amended *former* ORS 181.640(1)(d) (1997) to specifically provide that "the *department shall certify police officers*, reserve officers, fire service professionals, corrections officers, parole and probation officers, telecommunicators and emergency medical dispatchers as being qualified under the rules established by the board," where it had previously been the board's role to certify those employees. *See* HB 3738 (1997); Or Laws 1997, ch 853, § 4(1)(d) (emphasis added). At the same time, the legislature amended

other statutes related to the training of public safety personnel, in every instance changing the certification or training body from the board to the department. *See, e.g.,* ORS 133.245 (1997), *amended by* Or Laws 1997, ch 853, § 34(6) (authorizing a federal officer to make arrests upon certification by the department, rather than the board, after receiving proper training); ORS 353.050 (1997), *amended by* Or Laws 1997, ch 853, § 38(16) (special campus security officers at Oregon Health Sciences University are to be trained and certified by the department, rather than the board); ORS 453.374 (1997), *amended by* Or Laws 1997, ch 853, § 39(3) (the department, rather than the board, may coordinate its training programs with programs offered by other bodies); ORS 703.100 (1997), *amended by* Or Laws 1997, ch 853, § 49(1) (polygraph examiners' licenses issued and renewed by the department, rather than the board).

The legislature's sweeping 1997 changes, however, left ORS 813.131(2) untouched. DMV acknowledges on appeal that the legislature's demonstrated intention to transfer certification responsibilities from the board to the newly created department "was simply not reflected in the existing language of ORS 813.131(2)" at the time of petitioner's stop. DMV argues that, notwithstanding the statute's continued reference to certification by the "board" at the time of petitioner's stop, we should interpret it to give effect to the legislature's intent that certification be handled by the department.

As a general rule, "[i]f the legislature mistakenly omits language from a statute, it is for the legislature to correct the mistake." *Fernandez v. Board of Parole,* 137 Or App 247, 252, 904 P2d 1071 (1995). *See also* ORS 174.010 ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted or to omit what has been inserted * * *."). In this case, the plain text of ORS 813.131(2), at the time that Castilleja requested a urine test from petitioner, required drug-impairment certification by the "board."

We understand ORS 181.131(2) to have been impliedly amended, however, by the broad 1997 changes

that made the department, rather than the board, the certifying body for law enforcement officers. The doctrine of "implied amendment" concerns circumstances in which "the effect of [a] subsequent act is * * * to make [a statute enacted earlier] partially inoperative in certain situations." *Buehler v. Rosenblum*, 354 Or 318, 326, 311 P3d 882 (2013). "Amendment by implication is not favored but 'is recognized when the matter is clear.'" *Balzer Mch. v. Klineline Sand & Grav.*, 271 Or 596, 601, 533 P2d 321 (1975) (quoting *State v. Scott*, 237 Or 390, 397, 390 P2d 328 (1964)).

Here, the 1997 amendments to ORS chapter 181 transferred the duties of certification of police officers to the exclusive domain of the department. As a result, part of the text of ORS 813.131(2) was rendered effectively "inoperative" by those amendments because it ostensibly required certification from a state body—the board—that no longer had any authority to carry out that function. Moreover, if we were to interpret the statute to continue to require certification by the "board," the result would be that no police officer who, in 2013, held a certification from the "department" would be authorized to administer urine tests. The implied consent law, however, necessarily presumes that police officers exist who are statutorily permitted to request urine tests. Put differently, petitioner's construction would require us to conclude that the legislature impliedly *repealed* part of the implied consent law when it transferred certification functions to the new "department" but left intact the reference to "board" in ORS 813.131(2). We decline to ascribe such an intent to the legislature. For those reasons, we conclude that the proper construction of ORS 813.131(2) at the time of petitioner's license suspension is that it had been impliedly amended to permit certification by the department rather than the board.

For the foregoing reasons, we conclude that the trial court erred in reversing DMV's order suspending petitioner's driving privileges.

Reversed and remanded.